J-S72024-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: J.M.J., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.D.J., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 582 MDA 2018 |

Appeal from the Decree Entered March 8, 2018
In the Court of Common Pleas of Lancaster County Orphans' Court at
No(s):  2016-02380

BEFORE:  BOWES, J., SHOGAN, J., and KUNSELMAN, J.

MEMORANDUM BY SHOGAN, J.:            **FILED: JANUARY 11, 2019**

Appellant, J.D.J. ("Father"), appeals *pro se* from the decree granting the petition of Lancaster County Children and Youth Social Service Agency ("CYS"), seeking to involuntarily terminate Father's parental rights to his daughter, J.M.J. ("Child"), born in January of 2013, pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8) and (b) of the Adoption Act, 23 Pa.C.S. §§ 2101-2938.[1]  For the reasons that follow, we affirm.

The trial court presented the following history of this case:

> [Child] was born . . . in Lancaster County, Pennsylvania. Although Mother and Father were not married at the time of [C]hild's birth, they maintained a relationship for the first two years of [C]hild's life.  The relationship between Mother and Father has been and continues to be extremely toxic as evidenced by the

---

[1]  We note that the trial court appointed an attorney to serve as Child's guardian ad litem ("GAL") as well as an additional lawyer to serve as Child's attorney.

cross-filings of multiple Protection from Abuse actions (PFA's).[3] On March 29, 2015, when [C]hild was approximately two years old, Mother and Father had a domestic dispute which resulted in the West Lampeter police being called to the home. Mother and Father were both charged with simple assault and the police took protective custody of [Child].[4] The police made attempts to reach Paternal Grandparents to take temporary custody of [Child], however they were unable to reach them or any other suitable resource and were forced to call [CYS].

[3] May 17, 2013 filed by Mother against Father. July 1, 2013 filed by Father against Mother. March 31, 2015 filed by Mother against Father. August 10, 2016 filed by Father against Mother. September 26, 2016 filed by Mother against Father.

[4] Father was not initially charged, but after speaking with Mother, the officer asked Father to come to the station to answer some further questions. Father brought [Child] to the police station and after further investigation Father was charged and taken into custody and [C]hild was without a caretaker.

[CYS] thereafter filed for physical and legal custody of [C]hild and the application for shelter care was granted on March 31, 2015. [C]hild was found to be dependent following hearings that took place on May 12, 2015 and May 26, 2015 after determining that allegations A through E on the petition for dependency were proven by clear and convincing evidence.[5] Mother and Father were both given a Child Permanency Plan for reunification (hereinafter "CPP") at the time of the hearing.[6]

[5] The caseworker testified that after researching Father's criminal history she inadvertently included a previous conviction for D.U.I. in allegation F. Coincidentally, the conviction was for a different person that shared Father's name.

[6] This [c]ourt added a drug and alcohol goal to Mother's plan and removed Father's drug and alcohol goal based on the testimony presented.

Father's CPP included objectives to address mental health, to remain free of domestic violence, to remain crime free, to learn

and use good parenting skills, to be financially stable in order to provide for himself and his child, to obtain and maintain a home free and clear of hazards for himself and his child, and to maintain an ongoing commitment to his child. Mother's plan included the same objectives with the addition of a goal to remain free of drugs and misuse of alcohol.

[CYS] filed a Petition to Terminate the parental rights of Father and Mother on November 15, 2016. The initial termination of parental rights hearing was held on March 7, 2017.[7] At that time, this [c]ourt ordered a bonding assessment to determine the attachments between the parties.[8] The bonding assessments were completed and the first full hearing was held on August 15, 2017. Additional testimony was taken on October 23, 2017 and November 27, 2017.

> [7] The original date for the initial termination hearing was January 24, 2017, but was continued with the agreement of all parties to March 7, 2017.
>
> [8] This [c]ourt also [o]rdered for the juvenile file to be incorporated into the instant matter on that date.

Trial Court Memorandum Opinion and Decree, 3/8/18, at 1-3.

On March 8, 2018, the trial court found by clear and convincing evidence that both Mother's and Father's parental rights to Child should be terminated pursuant to section 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act. Father filed this timely appeal.[2, 3] Both Father and the trial court have

_____

[2] We observe Father timely filed the instant appeal on April 9, 2018. Indeed, Father needed to file his appeal by Monday, April 9, 2018 because April 7, 2018 was a Saturday. **See** 1 Pa.C.S. § 1908 (stating that, for computations of time, whenever the last day of any such period shall fall on Saturday or Sunday, or a legal holiday, such day shall be omitted from the computation).

[3] We note that Father's attorney of record, Gerald S. Robinson, filed a petition for leave to withdraw, which indicated that Father advised counsel that Father

complied with Pa.R.A.P. 1925.[4]

Father has preserved the following issue for our review:[5]

A.  The Court erred in Terminating Father's parental right to the child in which there was evdicence [sic] that FATHER had either COMPLETED or has been actively working on & completing all goals on Father's Permanency Plan.

Statement of Errors Complained of on Appeal, 4/9/18, at 1 (verbatim).

Father argues that the trial court erred in terminating his parental rights to Child.  Father's Brief at 2-20.  Father contends that, although he had not fully completed the CPP, the trial court should have considered the fact that he had been in substantial compliance with the CPP.  *Id*. at 2-12.

---

no longer wanted counsel to represent him in this matter.  Subsequently, the trial court permitted counsel to withdraw.

[4]  Mother also filed a timely appeal from the decree terminating her parental rights to Child, which was docketed at 575 MDA 2018.  We dispose of Mother's appeal in a separate memorandum.

[5]  We note that, in his *pro se* brief to this Court, Father has presented six issues for our consideration.  Father's Brief at 4-6 (unnumbered).  The issues include allegations of trial court error in admitting evidence, compliance with the Juvenile Act and Court Rules, prosecutorial misconduct, as well as basic challenges to the decision to terminate parental rights.  Father's Brief at 4-6 (unnumbered).  However, an appellant waives issues that are not raised in both his concise statement of errors complained of on appeal and the Statement of Questions Involved in his brief on appeal.  ***Krebs v. United Refining Company of Pennsylvania***, 893 A.2d 776, 797 (Pa. Super. 2006).  Therefore, we conclude that Father has waived any issues not pertaining to whether the evidence supported termination of Father's parental rights to Child due to his failure to include such challenges in his concise statement of errors complained of on appeal.  We will limit our review accordingly.

In reviewing an appeal from an order terminating parental rights, we adhere to the following well-established standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. **In re: R.J.T.**, 608 Pa. 9, 9 A.3d 1179, 1190 (2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. **Id.**; [**In re:**] **R.I.S.**, 36 A.3d [567,] 572 [(Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. **Id.**; **see also Samuel Bassett v. Kia Motors America, Inc.**, ___ Pa. ___, 34 A.3d 1, 51 (2011); **Christianson v. Ely**, 575 Pa. 647, 838 A.2d 630, 634 (2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. **Id.**
>
> As we discussed in **R.J.T.**, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. **R.J.T.**, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. **In re Adoption of Atencio**, 539 Pa. 161, 650 A.2d 1064, 1066 (1994).

**In re Adoption of S.P.**, 47 A.3d 817, 826-827 (Pa. 2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental

rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

Moreover, we have explained that:

> [t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.* (quoting *In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004). If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result. *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa. Super. 2003).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). This Court has explained that the focus in terminating parental rights under Section

2511(a) is on the parent, but under Section 2511(b), the focus is on the child.

*In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*).

As previously stated, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S. §§ 2511(a)(1), (2), (5), (8) and 2511(b). However, this Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). As did the trial court, we will focus upon Sections 2511(a)(8) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * *
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> * * *
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving notice of the filing of the petition.

23 Pa.C.S. §§ 2511(a)(8) and (b).

"[T]o terminate parental rights under Section 2511(a)(8), the following factors must be demonstrated: (1) [t]he child has been removed from parental care for [twelve] months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." *In re Adoption of M.E.P.*, 825 A.2d 1266, 1275-1276 (Pa. Super. 2003). In addition, we have explained the following:

> Section 2511(a)(8) sets a 12-month time frame for a parent to remedy the conditions that led to the children's removal by the court. Once the 12-month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of the Agency supplied over a realistic time period. Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of Agency services.

*In re Z.P.*, 994 A.2d 1108, 1118 (Pa. Super. 2010) (citations and quotation marks omitted).

We are also mindful that this Court has stated that a parent is required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.* at 340.

After hearing multiple days of testimony from the parties and their witnesses, the trial court analyzed the evidence and legal arguments in support of termination pursuant to Section 2511(a)(8). In its opinion that accompanied the decree terminating parental rights, the trial court offered the following discussion of its reasoning for termination:

> At the time of the final termination hearing on November 27, 2017, [Child] had been in [CYS's] custody for thirty-three months, a period of more than one-half of [C]hild's life. The totality of the record as summarized in this Opinion establishes by clear and convincing evidence that Father and Mother have not completed their respective [CPPs]. The record further supports that the conditions which led to placement continue to exist and that the termination of Father['s] . . . parental rights would best serve the needs and welfare of [Child].
>
> The case history can be divided into two separate and distinct parts. The first fifteen months of [Child's] placement was marked by progress with some missteps on the part of each parent. Nevertheless, at the time of the June 7, 2016 review hearing, the [c]ourt found that Father had substantial compliance with his CPP . . . . Father was set to begin transition visits with his daughter contingent upon the home being properly furnished and approval by the parent educator. Visits did eventually start in the Father's house that summer.
>
> However, problems between the parents began to resurface after the June hearing. Mother was charged with harassment and public drunkenness for an incident in July, 2016 when she allegedly vandalized Father's apartment. Allegations were also received that Father attempted to strangle Mother with a phone cord during an altercation that occurred in Atlantic City, New Jersey. These incidents came to light at an August 15, 2016 hearing. At that time the child had been in [CYS's] care for approximately seventeen months. Because of the new developments [CYS] indicated that it intended to file for termination of parental rights and would begin the process of finding a permanent resource home for [Child].

Following the August hearing, the [c]ourt allowed visits between Father and daughter to continue at Father's home. [CYS] did file a Petition to terminate the parental rights of Mother and Father on November 15, 2016. However, on December 6, 2016, before an initial hearing on the Petition could be held, Father was involved in an incident at his home during a visit with his child which caused [CYS] and this [c]ourt further concern about Father's emotional stability and his ability to control his anger. [Child] arrived for that visit with her caseworker. There were noticeable scratches on [Child's] face which Father questioned. The caseworker relayed that the child's resource parents had advised [CYS] that the scratches were self-inflicted. Father became agitated and demonstrated a hostility towards the caseworker. He demanded the child's immediate removal from the resource home. Father began questioning his daughter and asked her to scratch her own face to prove to the caseworker that his daughter would not do that. He then called EMS, and stated that he was not allowing the child to go back to [CYS] and would not allow the caseworker to leave with the child. At that time the caseworker called her supervisor and subsequently 911. Neither EMS nor the police reported to the home because Father eventually allowed the caseworker to leave with the child prior to the police arriving. This entire interaction lasted approximately thirty minutes. The child was present in the home and was upset by Father's demeanor. Based upon Father's conduct, [CYS] petitioned to return visits to [CYS] and to ensure the child's safety. This [c]ourt issued an Order on December 29, 2016 granting [CYS's] request and prohibiting visitation in the Father's home without consent of the Agency and the Guardian *ad litem*. All subsequent visits between Father and Child have been at [CYS].

Father's behaviors after the December 2016 incident continued to deteriorate up to the time of the final termination hearing to such an extent that the [c]ourt questions the actual progress that he had allegedly made in resolving his mental health, anger management, and domestic violence issues as of the June 2016 review hearing.

His ongoing anger and antisocial behaviors since December 2016, directed at [CYS], caseworkers and Deputy Sheriffs during child visits at [CYS] in the presence of [Child], and at other times is well documented in the record. He is confrontational, antagonistic, and defiant to [CYS] regulations. He ignores [CYS's] requests and recommendations that he use his visits to spend

- 10 -

quality time with his daughter. For example, when he discovered [CYS] only cancelled visits if he is fifteen minutes late, he chose to arrive fourteen minutes late to the visits with his daughter. He willingly gave up time with his daughter to waste [CYS's] time. More troubling is the testimony that he would often talk about the case with his daughter and complain about the various caseworkers instead of enjoying the time he was getting to spend with her. His various statements, promises, and actions, such as telling her that she would return home soon, that he would take her to Disneyworld for her birthday, and throwing her favorite shirt on the floor are incredibly confusing to a young girl and harmful for her emotional and mental well-being.

The totality of the record indicates that Father has been unable to maintain the progress he made on his CPP. His ongoing behaviors directly contradict his assertion that his goals are completed. It is axiomatic that progress must be maintained before a child will be returned to a parent. Not only does he continue to struggle with mental health, anger, and domestic violence, he jeopardized his crime free objective when he was convicted of two summary charges for harassment of his [CYS] caseworker and her supervisor. He was also evicted from his apartment during the ongoing termination proceeding. Finally, his commitment objective remains incomplete and is tied directly into his unresolved mental health and anger issues. His conduct at visits is unacceptable. He fails to understand the negative effect his behaviors have had on his daughter. His actions contradict the love which he says he has for her. Father's anger with [CYS] has consumed him and has alienated his child, causing her emotional harm and distress.

* * *

Terminating parental rights of . . . Father would best serve the needs and welfare of this child. Mother and Father have failed this child. In the thirty-three months that the child has been out of their care they have not been able to complete their plan without sabotaging each other or themselves. This child needs the stability and permanence that they are unable to provide. While parents express their love for [Child] they have been unwilling to put their dedication for their child at the forefront and have allowed their aggression towards each other, [CYS], and the caseworkers to take precedence. This child needs a home in which she can feel safe and secure. Terminating parental rights is the

only way that this child will be able to begin healing from the trauma that this extended placement has caused her. Her resource parents have continued to be willing and able to provide for her emotional, physical, and mental development and give this young girl the permanence she deserves.

Based upon the entirety of the record the [c]ourt finds that [CYS] has met their burden under Section 2511(a)(8) in proving by clear and convincing evidence that the child had been removed from parental care for more than twelve months, the conditions which led to the placement of the child continue to persist, and that the termination of Mother and Father's rights would best serve the needs and welfare of the child.

Trial Court Memorandum Opinion and Decree, 3/8/18, at 5-9 (footnote omitted).

Upon a careful review of the certified record, we conclude that the trial court aptly discussed the evidence pertaining to the requirements of section 2511(a)(8). It is undisputed that Child has been removed from parental care for more than twelve months. Furthermore, the conditions that led to placement of Child continue to exist. There is ample, competent, clear and convincing evidence in the record to support the trial court's determination that Father has not demonstrated any ability to remedy the circumstances which led to Child's placement, nor is there any indication that he could remedy such circumstances in the foreseeable future, even with continued services in place. Also, the record supports the trial court's conclusion that the termination of Father's parental rights best serves Child's needs and welfare. Accordingly, we discern no abuse of discretion by the trial court, and

affirm on the basis of its opinion, which is supported by the record and free of legal error.

Next, pursuant to Section 2511(b), we examine whether termination of parental rights would best serve the developmental, physical and emotional needs and welfare of Child. *In re C.M.S.*, 884 A.2d 1284, 1286-1287 (Pa. Super. 2005). "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *Id.* at 1287 (citation omitted).

Our Supreme Court has stated the following:

[I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). . . . In *In re E.M.*, 620 A.2d [481,] 485 [(Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

Pennsylvania courts have held that, in a termination of parental rights case, the trial court is required to consider "whatever bonds may exist between the children and [a]ppellant, as well as the emotional effect that termination will have upon the children." *In re Adoption of A.C.H.*, 803 A.2d 224, 229 (Pa. Super. 2002) (quoting *In re Adoption of A.M.R.*, 741 A.2d 666 (Pa. 1999) (citations omitted)). We have stated that, in conducting a bond analysis, the court is not required to use expert testimony, but may rely

- 13 -

on the testimony of social workers and caseworkers. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). *See also In re K.K.R.-S.*, 958 A.2d 529, 533 (Pa. Super. 2008) (observing that, in analyzing a parent-child bond, neither statute nor precedent require that a formal bonding evaluation be performed by an expert). This Court has also observed that no bond worth preserving is formed between a child and a natural parent where the child has been in foster care for most of the child's life, and the resulting bond with the natural parent is attenuated. *In re K.Z.S.*, 946 A.2d 753, 764 (Pa. Super. 2008). In addition, it is appropriate to consider a child's bond with their foster parents. *In re: T.S.M.*, 71 A.3d at 268.

"The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d at 763. The panel in *In re K.Z.S.* emphasized that, in addition to a bond examination, the court can equally emphasize the safety needs of the child and also should consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, the panel stated that the court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child. *Id*.

In *In re K.Z.S.*, this Court observed that, where the subject child had been almost constantly separated from his mother for four years, any relationship between the two had to be "fairly attenuated," such that the fact

that some bond existed did not defeat the termination of the mother's parental rights. *Id*. at 764. Based on the strong relationship that the child in *In re K.Z.S.* had with his foster mother, the child's young age, and his very limited contact with his mother, the panel found competent evidence to support the trial court's termination of the mother's parental rights, even without a bonding evaluation.

Furthermore, in *In re: T.S.M.*, our Supreme Court set forth the process for evaluation of the existing bond between a parent and a child, and the necessity for the court to focus on concerns of an unhealthy attachment and the availability of an adoptive home. The Supreme Court explained the following:

> [C]ontradictory considerations exist as to whether termination will benefit the needs and welfare of a child who has a strong but unhealthy bond to his biological parent, especially considering the existence or lack thereof of bonds to a pre-adoptive family. As with dependency determinations, we emphasize that the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. *See, e.g.,* [*In the Interest of*] *R.J.T.*, 9 A.3d [1179,] 1190 [(Pa. 2010)] (holding that statutory criteria of whether child has been in care for fifteen of the prior twenty-two months should not be viewed as a "litmus test" but rather as merely one of many factors in considering goal change). Obviously, attention must be paid to the pain that inevitably results from breaking a child's bond to a biological parent, even if that bond is unhealthy, and we must weigh that injury against the damage that bond may cause if left intact. Similarly, while termination of parental rights generally should not be granted unless adoptive parents are waiting to take a child into a safe and loving home, termination may be necessary for the child's needs and welfare in cases where the child's parental bond is impeding the search and placement with a permanent adoptive home.

- 15 -

In weighing the difficult factors discussed above, courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail, as we have in this case, the result, all too often, is catastrophically maladjusted children. In recognition of this reality, over the past fifteen years, a substantial shift has occurred in our society's approach to dependent children, requiring vigilance to the need to expedite children's placement in permanent, safe, stable, and loving homes. [The Adoption and Safe Families Act of 1997, P.L. 105-89] ASFA[,] was enacted to combat the problem of foster care drift, where children . . . are shuttled from one foster home to another, waiting for their parents to demonstrate their ability to care for the children. ***See In re R.J.T.***, 9 A.3d at 1186; ***In re Adoption of S.E.G.***, 901 A.2d [1017,] 1019 [(Pa. 2006)]. This drift was the unfortunate byproduct of the system's focus on reuniting children with their biological parents, even in situations where it was clear that the parents would be unable to parent in any reasonable period of time. Following ASFA, Pennsylvania adopted a dual focus of reunification and adoption, with the goal of finding permanency for children in less than two years, absent compelling reasons. ***See***, 42 Pa.C.S. § 6301(b)(1); 42 Pa.C.S. § 6351(f)(9) (requiring courts to determine whether an agency has filed a termination of parental rights petition if the child has been in placement for fifteen of the last twenty-two months).

***In re: T.S.M.***, 71 A.3d at 268-269.

Here, the trial court offered the following with regard to the analysis under Section 2511(b):

The Court must next consider whether the termination of parental rights is in the best interest of the child under Section 2511(b). It is not a mere formality flowing from the existence of the other required statutory elements; rather, it is a discrete consideration. In re Involuntary Termination of C.W.S.M., 839 A.2d 410 (Pa. Super. 2003). Section 2511(b) centers judicial inquiry upon the welfare of the child rather than the fault of the parent. In re A.R., 837 A.2d 560 (Pa. Super. 2003). In making tangible dimension as well as the intangible dimension - the love, comfort, security and stability - entailed in a parent-child relationship. In re [Adoption of] T.B.B., 835 A.2d 387 (Pa. Super.

2003). Continuity of relationship is also important to a child. In the Interest of C.S., *supra*.

The bond between a child and a parent is a proper matter to be evaluated in a termination of parental rights case. In re S.M.B., 856 A.2d 1235 (Pa. Super. 2004). Considering what situation would best serve the child's needs and welfare, the [c]ourt must examine the status of the bond between the natural parent and the child to consider whether terminating the parent's rights would destroy an existing, necessary and beneficial relationship. In re Adoption of T.B.B., *supra*. A child has the right to proper parenting and fulfillment of her potential in a permanent, healthy, and safe environment. In re J.A.S., 820 A.2d 774, 782 (Pa. Super. 2003).

Based upon careful review of the record and the evidence presented at the various hearings in this case, it is apparent to this [c]ourt that terminating Mother and Father's parental rights is in the best interest of [Child]. The [c]ourt in reaching this conclusion places considerable weight on the recommendation of the Guardian *ad litem* and the attorney for the child who both support [CYS's] petition to terminate parental rights.

[Child] through no fault of her own has spent more than half of her young life in foster care. She was a witness to the initial domestic violence between her parents which led to her placement in [CYS] custody. She has now been without permanency for more than thirty-three months. She has had to adapt to three separate resource homes and families while her parents inconsistently progressed on their CPPs. Sometimes during the visits her parents made considerable attempts to connect with her and show her the love and support expected from a parent. Other times the visits were a source of immense stress for [Child] as evidenced by her behaviors following the visits with her parents. Sometimes the visits did not occur at all because her parents did not show up. [Child] has been on an emotional roller coaster and desperately needs stability and permanence in her life. Both parents have made it abundantly clear through their actions that they are unable to provide her with that stability.

This [c]ourt in reaching its decision also relies on the bonding assessment done by Diane Edmond.[10] While it is true that this was her first bonding evaluation, she has been a licensed professional counselor since 2002, performed numerous

- 17 -

biopsychosocial evaluations, and has the necessary educational and professional experience that qualifies her to perform a bonding evaluation. Through her extensive interactions with the parties in this case, she found that [Child] was most bonded with her resource parents despite the relatively short amount of time that the child resided with them. [Child] referred to them as her Mom and Dad and often initiated play and contact with them. To the contrary, the child displayed hypervigilance and caution when starting a visit with the biological parents, although eventually the child would warm up to them over the course of the visit.

> [10] Karen Jaskot who is normally retained to do bonding assessments in Agency cases has a conflict of interest as she [was] originally hired to do the parent's biopsychosocial evaluations.

The [c]ourt does not doubt that Father and Mother both love [Child] very much. However, the focus of this [c]ourt must be on what is in the best interest of the child. Mother and Father have demonstrated to this [c]ourt that they do not have the emotional maturity or stability to consistently parent this child. Moreover, any relationship that existed between this child and her parents is broken and is no longer beneficial for her. Termination of their rights will allow [Child] to have a conclusion to this tumultuous period of her life and to feel the safety and stability of an intact family unit.

[Child's] resource family has been able to provide for her developmental, emotional, and physical needs since they took over her care in February of 2017. [Child] looks to them as her family as evidenced by the bonding assessment in which she was asked to draw her family and she identified her resource parents instead of her biological parents. Her resource family provides her with the safety and stability that is essential to her developmental and emotional growth. While initially nervous about being first time adoptive parents, it is clear to this [c]ourt that the resource parents are well-equipped to nurture this child and give her the love and permanence that she deserves. [Child] is thriving in her current environment and deserves to remain in this home without disruption. The bond that exists between this child and her resource parents is essential and necessary to her well-being and terminating that connection would cause significant harm to [Child]

Trial Court Memorandum Opinion and Decree, 3/8/18, at 9-12.

Upon review of the record, the briefs of the parties, and the relevant law, we conclude the trial court correctly determined that CYS satisfied the burden of proof by clear and convincing evidence that the termination of Father's parental rights would best serve the needs and welfare of Child pursuant to Section 2511(b). Again, we discern no abuse of discretion by the trial court and affirm based on its opinion, which is supported by the record and free of legal error.

Because the trial court's determinations are supported by competent evidence, we conclude there was no abuse of discretion or error of law on the part of the trial court when it terminated Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(8) and (b). Consequently, we affirm the decree terminating Father's parental rights to Child.

Decree affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 01/11/2019

- 19 -